EMPIRE STEEL CASTINGS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Empire Steel Castings v. Comm'r
Docket Nos. 5424-70, 6615-71. United States Tax Court
T.C. Memo 1974-34; 1974 Tax Ct. Memo LEXIS 288; 33 T.C.M. (CCH) 155; T.C.M. (RIA) 74034; February 4, 1974, Filed. Thomas P. Glassmoyer and John J. Cunningham, for the petitioner.
Alan E. Cobb, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION
FAY, Judge: Respondent determined deficiencies in petitioner's Federal income tax as follows: Docket No.
Year
Deficiency 5424-70
1965
$ 99,514.25
1966
104,466.65
6615-71
1967
102,876.00
1968
72,285.00
The sole issue for determination is whether petitioner unreasonably accumulated any or all of its earnings and profits during the years in issue for purposes of determining 2 whether petitioner is subject to the accumulated earnings tax for these years.
In his notices of deficiency dated May 28, 1970, and July 26, 1971, respondent determined that petitioner was subject to the accumulated earnings tax imposed by section 531 of the Internal Revenue Code of 1954[1] for the years in issue.
Prior to respondent's issuance of the notices of deficiency in the instant case, respondent properly notified petitioner pursuant to the provisions of section 534(b) that the proposed deficiency notices *291 included a section 531 tax. In response to this notification, petitioner prepared, and submitted to respondent, a section 534(c) statement detailing the grounds upon which petitioner relied to establish that all or any part of the pertinent earnings and profits were accumulated due to reasonable business needs.
Petitioner alleged in its petitions filed with this Court that the section 534(c) statement was sufficient under section 534(a) (2) to shift to respondent the burden of proof relating to petitioner's allegation that its earnings and profits for the years in issue were not accumulated beyond its reasonable business needs. Respondent 3 denied that petitioner's section 534(c) statement was sufficient to shift the burden of proof.
Subsequently, on September 27, 1972, petitioner filed a motion with this Court requesting that the burden of proof be shifted to respondent with respect to the issue of whether petitioner's earnings and profits were accumulated beyond the reasonable needs of its business during the years in issue. After carefully reviewing the section 534(c) statement and the underlying pleadings, this Court determined that, with some exceptions, the burden of *292 proof should be shifted to respondent. Accordingly, by an order dated October 30, 1972, this Court decreed that the burden of proof with respect to the accumulation of earnings and profits for the years in issue should be upon respondent,
except (1) as to petitioner's allegation that a portion of its earnings and profits was reasonably accumulated in the taxable year 1965 to finance the construction of capital improvements to petitioner's plant and facilities; and (2) as to petitioner's allegation that a portion of its earnings and profits was reasonably accumulated in the taxable years 1965 and 1966 to finance petitioner's anticipated entry into the precision steel casting business.
FINDINGS OF FACT
Some of the facts have been stipulated; the stipulation of facts, and the exhibits attached thereto, are incorporated herein by this reference.
Petitioner is a Pennsylvania corporation with its principal office located at Reading, Pennsylvania. Petitioner is 4 engaged in the business of manufacturing and selling steel castings.
Petitioner's tax returns for the years in issue were filed with the district director of internal revenue at Philadelphia, Pennsylvania.
In the year *293 1936, McCormick G. Moore (Moore) was appointed the general manager of petitioner at the age of 29, at which time Moore held a very small percentage of the stock outstanding in petitioner. In 1944 Moore acquired the balance of the stock outstanding in petitioner by borrowing funds with which to acquire a portion of that stock and by having petitioner redeem the remainder.
Since the year 1944, all of the stock outstanding in petitioner has been held by either Moore or members of his family. At the present time Moore is the president and a member of the board of directors of petitioner. Moore is 67 years of age and has worked in the steel castings business in one capacity or another for virtually his entire life, beginning in the year 1920 at the age of 14 and continuing up through the present time. Moore's father and uncle also were in the steel castings business, having poured the first heat of steel at another and unrelated steel castings company in the year 1906.
Petitioner manufactures the steel castings by preparing molds, melting and pouring the steel into the molds to form 5 the castings, and cleaning and treating the castings. Petitioner forms the molds with the use *294 of sand and either a wooden or metal pattern, the sand being packed and rammed by hand around the pattern. Petitioner melts the steel with the use of large furnaces. Petitioner cleans and heat treats the castings after they have solidified and have been removed from the molds. It removes the castings from the molds by loosening and shaking out the sand and thereby freeing the castings from the molds. Petitioner loosens and shakes out the sand by vibrating the molds and by hitting the molds with hand hammers. In its present facilities petitioner is unable to manufacture steel castings which weigh more than 5500 pounds.
Petitioner is experiencing a strong demand for heavier and larger steel castings. In the year 1936 petitioner's melting facilities consisted of one electric arc furnace. At the prsent time petitioner's melting facilities consist of two electric arc furnaces and two induction furnace setups.
In the year 1936 petitioner's production capacity was 65 tons per month. At the present time petitioner's melting capacity alone is 650 tons per month, and its overall production capacity is 400 tons per month.
Petitioner manufactures both carbon steel and alloy steel castings *295 in the same plant. Alloy steel is any steel which contains a specified percentage of some metal alloy, such as chrome, nickel, molybdenum or selenium. High alloy steel is any steel which contains 8 percent or more of the metal alloy, and low alloy steel is any steel which contains less than 8 percent of the metal alloy. Carbon steel is regular steel and contains very little or no metal alloy. Generally, the durability and strength of a casting is dependent upon the type of steel and amount of pressure used in its manufacture; e.g., so-called stainless steel is a high alloy steel and a casting made of stainless steel would resist corrosion. In the year 1936 petitioner's high alloy steel castings were made from three or four different chemical analyses. At the present time petitioner's high alloy steel castings are made from somewhere between 97 and 105 different chemical analyses. Due to the desirable characteristics of high alloy steel, petitioner is experiencing a tremendous demand for high alloy steel castings.
Between the years 1958 and 1962 petitioner began manufacturing steel castings for use in nuclear facilities. Petitioner is one of approximately nine steel castings *296 manufactures in the country authorized to manufacture steel castings for use in nuclear facilities. Steel castings manufactured by petitioner for use in nuclear facilities are subject to very severe and demanding specifications. Due to these severe specifications, and the resultant high rejection rate, the steel castings manufactured by petitioner for use in nuclear facilities have never generated a profit, but petitioner continues to do that type of work because it is the trend of the future and should benefit other segments of the steel castings industry. Petitioner is experiencing a tremendous demand for its nuclear work. It owns radiographic facilities which it uses to x-ray steel castings manufactured for use in nuclear facilities in order to determine whether there are any internal defects in the castings.
Petitioner owns all of the stock outstanding in Empire Precision Casting Corporation (Empire), a Pennsylvania corporation formed by petitioner in 1970 for the purpose of manufacturing precision steel castings. Precision steel castings are manufactured much closer to specifications than regular steel castings because of the manner in which the molds are prepared and *297 formed. Due to the ever increasing demands of its customers for precision steel castings, petitioner considered entering the precision steel castings business at least as early as the year 1965. From the year 1965 until it decided to form Empire, petitioner made numerous inquiries and elicited information from various sources in an effort to determine whether it would be more desirable to acquire an existing precision steel castings manufacturer rather than form an entirely new company. Petitioner has invested approximately $250,000 in Empire, consisting of an initial investment of $50,000 and an additional investment of $200,000, all of which has been expended by Empire in connection with its operations. Empire has never earned a profit, and it is anticipated that additional funds will be invested by petitioner before Empire begins to earn a profit.
Petitioner's castings generally are incorporated in some product manufactured by its customers and do not represent a finished product in that sense. Petitioner is a jobbing, as opposed to a captive, foundry in the sense that it is not controlled by, and does not manufacture castings for, any one customer or any relatively *298 few customers, but is independent and manufactures castings for many different customers. Petitioner specializes in pressure castings, i.e., castings that are subject to internal pressure, such as valves and pumps and fittings. It has approximately 160 customers, one of which accounts for 25 percent of its business. By reason of the fact that it is a jobbing foundry, (a) petitioner manufactures relatively small quantities of any one item, thereby requiring the frequent changing of patterns and the use of much hand labor, and (b) petitioner's business is dependent upon general business conditions in the country, i.e., its business fluctuates with that of its customers, and is dependent upon the demand for the products of its customers rather than its own.
Petitioner's business is highly competitive. It sustained a net operating loss for the calendar year 1971 in the amount of $209,423 and sustained a net operating loss for the first six months of the calendar year 1972 in the amount of $189,705. Petitioner is one of approximately 190 steel casting foundries in the country, of which approximately 115, including petitioner, are jobbing foundries.Petitioner's customer area *299 is limited to the northeastern section of the United States. Petitioner competes with between 20 to 30 jobbing foundries which do business in its customer area. From the year 1965 to the present time, approximately 34 steel casting foundries operating within petitioner's customer area have closed because they failed to modernize. Petitioner's ability to continue to compete in the steel casting business is dependent, in large part, upon its ability to expand and modernize its plant and equipment.
In the year 1936 petitioner employed approximately 34 people. At the present time petitioner employs approximately 350 people, of whom approximately 300 are production workers. Petitioner's production workers are members of the Steelworkers Union. Petitioner's union contract is negotiated every three years, the present contract having become effective on February 1, 1972, and expiring on January 31, 1975. Petitioner's business has been interrupted by labor strikes, as follows: Began
Ended
Elapsed Time January 21, 1946
April 2, 1946
10 weeks
February 3, 1960
May 1, 1950
13 weeks
January 1, 1966
February 3, 1966
4-1/2 weeks
February 1, 1972
March 9, 1972
5-1/2 weeks
*300 Petitioner's metallurgic department determines the chemical composition of all castings manufactured by it. Petitioner's metallurgic department also engages in chemical research in an effort to improve existing alloys and develop new alloys. Petitioner benefits from the research of other organizations through its membership in the Steel Foundry Society of America, a trade association. Petitioner's research is conducted in its laboratory, but approximately ten years ago petitioner concluded that the laboratory was inadequate.
In the year 1962 petitioner received complaints from its neighbors concerning the smoke pollutants being emitted from its plant. In the year 1964, petitioner engaged several engineering concerns to develop a solution to its smoke pollution problem. In the year 1965 petitioner was notified by the Pennsylvania Department of Health concerning its smoke pollution problem. Thereafter, petitioner was notifed by the Township of Muhlenberg, the township in which its plant is located, concerning its smoke pollution problem.
Petitioner corresponded extensively with the governmental authorities and with the engineering concerns which it engaged concerning *301 possible solutions to the air pollution problem. At all times petitioner was willing to control the emission of smoke pollutants from its plant, but neither the regulatory authorities nor the engineering concerns engaged by petitioner were able to develop a satisfactory solution to the problem.Finally, a satisfactory solution to the problem was developed, and smoke control and collection equipment was installed in petitioner's plant in the year 1969. Petitioner also is subject to the provisions of the Occupational Health and Safety Act, a Federal program requiring the purchase of equipment and expenditures of substantial sums of money for the purpose of protecting the health and safety of petitioner's employees. Petitioner anticipates that the cost of complying with the regulations promulgated under the Occupational Health and Safety Act will be substantial.
Petitioner's policy always has been to finance its capital improvement with its own funds rather than borrow funds for that purpose.
Petitioner's earnings and profits account increased by approximately 1.2 million dollars during the period from January 1, 1960, through December 31, 1968. Petitioner invested approximately *302 1.7 million dollars in equipment, machinery, and specific capital improvement projects during the years from 1960 through 1968.
Petitioner's net liquid assets increased during the years 1960 through 1968.
As of December 1, 1965, petitioner planned capital improvement projects totalling $488,250, as follows:
(a) replacing the roof over the east bay of its cleaning room at a cost of approximately $70,000;
(b) installing smoke control and collection equipment at a cost of approximately $100,000 - completed in 1969 at a total cost of approximately $101,000;
(c) constructing a new radiographic building at a cost of approximately $90,000 - completed in 1966 at a cost of approximately $92,000;
(d) altering the plumbing and electrical systems in the air compressor room at a cost of $35,000 - completed in 1966 at a total cost of approximately $44,000;
(e) acquiring scrap yard material handling equipment at a cost of $35,000;
(f) acquiring three high speed grinders at a total cost of $10,000 - two were acquired in 1966 at a cost of approximately $6,500;
(g) constructing a new pattern storage building at a cost of $35,000 - completed in 1966 at a cost of approximately $42,000; *303 (h) constructing a new pattern set out building at a cost of $7,500 - completed in 1966 at a cost of approximately $9,500;
(i) acquiring a 10-ton bridge crane and no-bake core machine - acquired in 1966 at a total cost of approximately $38,500;
(j) constructing a new maintenance shop at a cost of $25,000 - completed in 1966 at a cost of approximately $40,000;
(k) improving its heating plant and locker room facilities at a cost of $25,000; and
(1) a contingency allowance in the amount of $17,250 - the entire allowance was used because the actual expenditures exceeded the estimated expenditures by more than $17,250, as indicated in (a) through (k) above.
Petitioner still plans to replace the roof over the east bay of its cleaning room, and petitioner has received estimates of the cost of construction.
Petitioner still plans to acquire scrap yard material handling equipment, and petitioner has received estimates of the cost of acquiring scrap handling equipment.
Petitioner still plans to improve and expand its locker room facilities, and petitioner has received estimates of the cost of doing so.
Capital Improvement Programs (1) Generally Petitioner adopted *304 a three-year capital improvement program dated July 1, 1960, which was prepared and developed by petitioner's engineers in conjunction with outside engineers.
Petitioner adopted three separate five-year capital improvement programs dated December 27, 1966, December 30, 1969, and December 30, 1970, respectively, including supporting blueprints, which were prepared and developed by petitioner's engineers in conjunction with outside engineers.
As a part of its long-term capital improvement programs, petitioner planned to expand its molding and cleaning facilities and thereby match the production capacity of its molding and cleaning facilities with that of its melting facilities. By increasing the overall production capacity of its plant, petitioner could increase its volume of business and better service its customers. Petitioner periodically reviews and revises its long-term capital improvement programs prior to completion of all of the projects planned because it needs constantly are changing and other needs more pressing than those initially anticipated frequently arise.
(2) December 27, 1966, five-year capital improvement program As of December 27, 1966, petitioner planned capital *305 improvement projects totalling $1,245,900 as follows: *306 1967
Estimated
Project
Costs
Totals
New Induction Melting Equipment
$ 135,000
Smoke Control & Collection
Equipment
125,000
Non-Destructive Testing
Equipment
15,300
Sand Preparation & Control
Equipment
9,300
1500 amp Arc-Air Machine -
Cleaning Dept.
1,800
Surface Grinder - Cleaning Dept.
4,500
Scrap Handling Equipment -
Melting Dept.
19,500
Roller Conveyor - Core Dept.
1,500
Air Compressors - Water Treatment Equipment
500
Mezzanine Floor - Maintenance
and Carpenter
6,000
$ 320,900
1968
Locker Room & Shop Office
Improvements:
Basic Plan
$ 55,000
Necessary Patter Shop
Rearrangement
15,000
Cleaning Room Expansion
Building 60' x 200'
240,000
Improved Jold Rollover Draw
Molding Facilities
20,000
330,000
1969
Equipment for Expanded Cleaning Room:
Annealing Furnace
$ 60,000
Quench Facilities
15,000
Blast Room
50,000
Welding & Arc-Air Equipment
10,000
Compressed Air
15,000
Bridge Crane
35,000
$185,000
Improved Shakeout Facilities
35,000
Additional Shakeout Sand Storage
25,000
245,000
1970
Addition to North End of Foundry
60' x 100'
$ 120,000
Replacement Roof East Bay of
Present Cleaning Room
45,000
Scrap Handling Gantry Crane
40,000
205,000
1971
Sand Slinger & Accessories
$ 100,000
New Pattern Shop
45,000
145,000
Total
$ 1,245,900
Petitioner did not complete all of the projects listed on its December 27, 1966, five-year capital improvement program, but most of the projects which were not completed are still planned and appear in the capital improvement programs dated December 30, 1969, and December 30, 1970.
1967 projections: Petitioner's new induction melting facility was completed at a total cost of approximately $195,000. It's smoke control and collection equipment was installed in 1969 at a total cost of approximately $101,000. All of the remaining projects listed on the December 27, 1966, five-year capital improvement program and scheduled for 1967, with the exception of the scrap handling equipment, were completed by petitioner. Petitioner has received estimates of the cost of acquiring the scrap handling equipment.
1968 projections: Petitioner has received estimates of the cost of expanding its cleaning room. Petitioner's locker room and shop office must be improved and expanded because the expansion of its cleaning facilities would require the employment of additional production workers. It has received estimates of the cost of improving and expanding its locker room and *307 shop office facilities. As a part of its plan to expand the production capacity of its molding facilities, petitioner has received estimates of the cost of acquiring jolt rollover draw molding equipment and similar equipment.
(3) Additional Capital Improvement Projects As of December 31, 1967, petitioner, in addition to the capital improvement projects listed on the December 27, 1966, five-year capital improvement program, planned additional capital improvement projects not listed on the program, some of which were completed during the calendar year 1968.
As of December 31, 1968, petitioner, in addition to the capital improvement projects listed on the December 27, 1966, five-year capital improvement program, planned additional capital improvement projects not listed on the program, some of which were completed during the calendar year 1969.
Long-range plans: Petitioner anticipates that the gradual expansion of its nuclear work will require a similar expansion of its existing manufacturing facilities, as well as the improvement and expansion of its radiographic facilities.
Petitioner desires to construct a new plant in which it would manufacture heavier and larger steel *308 castings, and anticipates that the cost of construction would be approximately $6,000,000. It further desires to construct a separate plant in which it would manufacture high alloy steel castings, and estimates that the cost of construction would be approximately $4,500,000.
Finally, petitioner holds an option on a piece of ground adjoining its present plant and plans to construct a new laboratory on that ground.
Working Capital Needs Under the operating cycle approach, petitioner's working capital needs for each of the years in issue were: Year
Working Capital Needs 1965
$720,744
1966
903,219
1967
929,305
1968
970,522
As of the close of each of the years in issue, petitioner's net liquid assets were: Item
1965
1966
1967
1968 Cash
$1,127,675
$1,123,197
$1,176,609
$1,303,145
Trade Accounts
Receivable
385,739
572,004
503,991
424,211
Inventories
281,956
270,226
296,761
395,075
Interest
Receivable
-
-
-
12,250
Available
Current Assets
$1,795,370
$1,965,427
$1,977,361
$2,134,681
Current
Liabilities
566,365
602,635
430,865
402,143
Net Available
Liquid Assets
$1,229,005
$1,362,792
$1,546,496
$1,732,538
*309 Petitioner has never made personal loans to Moore or members of his family.
Petitioner has paid the following cash dividends: Year
Dividend 1941
$18,150
1942
36,300
1967
7,200
1968
22,240
Petitioner owns stock in Carpenter Technology Corp. (Car-Tech) which it acquired in 1962 for $40,390. Car-Tech is a Reading, Pennsylvania company. Car-Tech does research 20 and analyzes steel alloys for petitioner either for no charge or only a minimal charge. Car-Tech is a customer of petitioner.
Petitioner was justified in retaining at least $450,000 in 1965 and at least $900,000 during each of the years from 1966 through 1968 for modernization and expansion.
Petitioner was justified in accumulating $200,000 for each of the years from 1965 through 1968 for the purpose of entering into the precision steel castings business.
ULTIMATE FINDING OF FACT
Petitioner's earnings and profits were not permitted to accumulate beyond the reasonable needs of its business during the taxable years 1965, 1966, 1967, and 1968.
OPINION
Section 532(a) imposes the accumulated earnings *310 tax on corporations that are formed or availed of for the prohibited purpose of avoiding individual income taxes at the shareholder level. [2]Section 533(a), in turn, establishes the presumption that the accumulation of earnings and profits beyond the reasonable needs of the business shall be determinative of the purpose to avoid the shareholders' income taxes unless the corporation shall prove to the contrary by a preponderance of the evidence. [3] To the extent that the corporation can establish that it retained all or any part of its earnings and profits to meet the reasonable needs of its business, such an amount will be allowed as a credit in the arithmetic computation of whether the corporation has accumulated taxable income which, in turn, affects the applicability of the accumulated earnings tax. [4] Pursuant to section 537, the term "reasonable needs of the business" encompasses the reasonably anticipated need of the business.
*311 Whether a corporation has permitted its earnings and profits to accumulate beyond its reasonable needs is a question of fact. Helvering v. Nat. Grocery Co., 304 U.S. 282 (1938); John P. Scripps Newspapers, 44 T.C. 453 (1965).
In considering this factual issue, we recognize that it is the responsibility of the corporate officers and directors to determine the reasonable business needs of a particular business. Accordingly, we are hesitant to substitute our business judgment for that of corporate management unless the facts and circumstances require such action on our part.
It is apparent that petitioner had accumulated a substantial surplus as of the beginning of 1965 and that it continued to prosper during the years in issue.For the years here relevant, petitioner's earned surplus account showed beginning balances (without adjustment to include stock dividends) of $2,410,441.15 (1965), $2,694,765.05 (1966), $2,623,741.71 (1967), and $2,917,348.33 (1968).
The *312 crucial factor, however, is not the monetary size of the accumulated earnings and profits but the liquid position of petitioner and the relation of this liquidity position to current and anticipated business needs. See Faber Cement Block Co., 50 T.C. 317, 328-329 (1968); and Smoot Sand & Gravel Corporation v. Commissioner, 274 F.2d 495, 500-501 (C.A. 4, 1960), affirming a Memorandum Opinion of this Court.
In this context, we have found, and so hold, that petitioner's liquidity position as of December 31 of each of the years involved herein was as follows:
1965
1966
1967
1968 Current
Assets [5]
$1,795,370
$1,965,427
$1,977,361
$2,134,681
Less: Current
Liabilities
566,365
602,635
430,865
402,143
Total Availabilities
$1,229,005
$1,362,792
$1,546,496
$1,732,538
*313 The relationship of petitioner's liquid assets to its current and anticipated needs during the years in issue is significant. If petitioner's liquid assets (out of which dividend distributions could be made) exceeded its current and anticipated needs, this is a strong indication that petitioner's accumulations of surplus were beyond the reasonable needs of the business. However, if the converse is true (i.e., if petitioner's current and anticipated needs exceeded its liquid assets), this is indicative that petitioner's accumulations were dictated by reasonable business needs. See Smoot Sand & Gravel Corporation v. Commissioner, supra at 500-501; Faber Cement Block Co., supra at 327-328; and John P. Scripps Newspapers, supra at 467.
In making this analysis in the instant case, we have scrutinized the underlying facts in great detail. An examination of these facts reveals that petitioner has not remained static, but, on the contrary, has grown from a company with 34 employees and a production capacity of 65 tons per month in 1936 to a company with approximately 350 employees and an overall production capacity of 400 tons *314 per month and a melting capacity of 650 tons per month at the present time. Petitioner's earnings and profits account increased approximately 1.2 million dollars during the period from January 1, 1960, through December 31, 1968. Moreover, petitioner has not allowed its earnings to remain idle, but, instead, has continually utilized earnings to improve and modernize its physical plant. This conclusion is substantiated by the fact that, for the period from 1960 through 1968, petitioner invested approximately 1.7 million dollars of its earnings in equipment, machinery, and specific capital improvement projects.
In view of petitioner's consistent pattern of financing its growth internally through the usage of retained earnings rather than from issuance of additional equity or commercial borrowing, we have found, and so hold, that petitioner was justified in retaining at least $450,000 in 1965 and at least $900,000 during each of the years from 1966 through 1968 for modernization and expansion. See Bremerton Sun Publishing Co., 44 T.C. 566, 585 (1965).
Respondent contends that the amounts that petitioner should be permitted to accumulate for modernization and expansion *315 purposes should be substantially less than those amounts which we determined in the preceding paragraph. Respondent premises his contention on the fact that a substantial number of projects ostensibly adopted by petitioner as part of its physical improvement program were not completed either in the projected year or as of the date of trial, and that a number of these programs were not formally included in the minutes of the annual meetings conducted by petitioner's board of directors. We are not persuaded by either of these arguments.
First, the mere fact that a number of petitioner's expansion and/or modernization projects may not have been completed either during the anticipated completion year or prior to the trial of this case is not conclusive. The crucial factor is that although petitioner's retained earnings account increased by only approximately 1.2 million dollars during the years 1960 through 1968, petitioner invested approximately 1.7 million dollars in its physical plant facilities. The obvious explanation for the fact that some projects may not have been completed is that other projects merited priority status. Moreover, the fact that other projects were *316 more important negates neither the ultimate importance of the uncompleted programs nor the reasonableness of the accumulation of earnings for these uncompleted programs. We will not place ourselves in the posture of second-guessing management as to priorities in this context. Furthermore, where management has made the decision to finance its growth through the usage of retained earnings and where a consistent effort is made to use substantially all of the corporation's retained earnings in this expansion/modernization program, we will not allow the imposition of the section 531 tax merely because some of petitioner's planned projects are required to be postponed due to other priority physical facility needs. [6]
*317 Second, the mere fact that a number of petitioner's projects (specifically, a five-year program conceived of in 1966 for initiation in 1967) was not formally included in the minutes of petitioner's board of directors' December 1966 annual meeting is not conclusive that this plan was not conceived of and adopted in 1966. As this Court stated 28 in Bremerton Sun Publishing Co., supra at 584-585; and John P. Scripps Newspapers, supra at 469: "A closely held corporation cannot be held to the same strict formalities of large public corporations." Accordingly, after reviewing the record in the instant case, we are convinced that petitioner did adopt the five-year program in 1966 for implementation commencing in 1967.
In analyzing petitioner's reasonable business needs for the years in issue, we have carefully considered the amounts required by petitioner as working capital to fund its operating expenses "for one business cycle" during each of the involved taxable years. We have found, and so hold, that petitioner's working capital needs for one business cycle *318 during each of the years in issue were as follows: Year
Working Capital Needs 1965
$720,744
1966
903,219
1967
929,305
1968
970,522
In reaching these determinations we concluded that both parties failed to give proper consideration to certain aspects. For example, respondent did not include Federal income taxes in the working capital computation. We disagree. Since petitioner was required to pay estimated taxes during each of the years in issue, this item is an operating expense which should be appropriately reflected in the equation used to determine the monetary amount needed to fund operations for one business cycle. [7] On the other hand, petitioner argued that it was entitled to increase its working capital needs for the years in issue to reflect the possibility of labor difficulties. We are not persuaded by this argument. The actual work interruptions caused by labor walkouts were nominal, and certainly cannot be equated to the strike-produced shortages incurred in Dielectric Materials Co., 57 T.C. 587 (1972). Accordingly, we have not allowed any consideration of this factor in computing petitioner's working capital needs. [8] *319 *320 Finally, after reviewing the record with respect to the reasonableness of petitioner's accumulations during the years in issue for entrance into the precision steel castings business, we have concluded that petitioner did decide to enter into this business no later than 1965. We recognize that funds for this purpose were not actually authorized until 1969. We do not consider this factor controlling however. Petitioner had made the decision to enter this business long before 1969. The primary question confronting petitioner was the decision of whether petitioner should construct new physical facilities for this operation or whether it should acquire an existing physical structure and convert it into a plant capable of accommodating a precision steel castings operation. It was the difficulty of making this type of decision that delayed the actual authorization of funds. Accordingly, since we are persuaded that the actual decision to enter this business was made no later than 1965, we have concluded that petitioner reasonably accumulated funds for this purpose commencing in 1965. However, although we believe that petitioner could reasonably have anticipated that the new *321 business might prove to be an expensive undertaking, we are convinced that the accumulation of $300,000 in each of the years in issue was excessive. After carefully examining the record in this regard, we have concluded that petitioner was entitled to accumulate $200,000 for this purpose during each of the years in issue.
After collating the results of our analysis, we have concluded that petitioner's current and anticipated business needs exceeded its net liquid assets during each of the years in issue. This conclusion is illustrated by the following tabular summary of our analysis for each of the pertinent years: 1965
1966
1967
1968 Net liquid
assets
available
$1,229,005
$1,362,792
$1,546,496
$1,732,538
Working
capital needs
$ 720,744
$ 903,219
$ 929,305
$ 970,522
Addl.
anticipated
business
needs [1]
650,000
1,100,000
1,100,000
1,100,000
Total
current and
anticipated
business
needs
$1,370,744
$2,003,219
$2,029,305
$2,070,522
Accordingly, we have concluded that petitioner's accumulations of earnings and profits during each of the years *322 in issue were required by the reasonable needs of its business. Thus, we have no need, in light of the credit provided for in section 535(c) (1), to consider whether the proscribed purpose of avoiding income tax may have existed. See John P. Scripps Newspapers, 44 T.C. at 474.
To reflect a concession by the petitioner, decision will be entered under Rule 155 in Docket No. 5424-70. Decision will be entered for the petitioner in Docket No. 6615-71. Footnotes
1. All section references are to the Internal Revenue Code of 1954.↩
2. SEC. 532. CORPORATIONS SUBJECT TO ACCUMULATED EARNINGS TAX.
(a) General Rule. - The accumulated earnings tax imposed by section 531↩ shall apply to every corporation (other than those described in subsection (b) formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed.
3. SEC. 533. EVIDENCE OF PURPOSE TO AVOID INCOME TAX.
(a) Unreasonable Accumulation Determinative of Purpose. - For purposes of section 532↩, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary.
4. SEC. 535. ACCUMULATED TAXABLE INCOME.
(a) Definition. - For purposes of this subtitle, the term "accumulated taxable income" means the taxable income, adjusted in the manner provided in subsection (b), minus the sum of the dividends paid deduction (as defined in section 561) and the accumulated earnings credit (as defined in subsection (c)).
* * *
(c) Accumulated Earnings Credit. - (1) General Rule. - For purposes of subsection (a), in the case of a corporation other than a mere holding or investment company the accumulated earnings credit is (A) an amount equal to such part of the earnings and profits for the taxable year as are retained for the reasonable needs of the business, minus (B) the deduction allowed by subsection (b) (6). For purposes of this paragraph, the amount of the earnings and profits for the taxable year which are retained is the amount by which the earnings and profits for the taxable year exceed the dividends paid deduction (as defined in section 561↩) for such year.
5. In computing current assets we have excluded prepaid expenses. We recognize that prepaid expenses were included in the computation of current assets in Bardahl International Corp., T.C. Memo. 1966-182. However, the Bardahl result was Corp., T.C. Memo. 1966-182↩. However, the Bardahl result was dictated by the fact that the prepaid expenses were primarily advertising expenses and that the advertising expenses were included in the operating costs considered in the working capital computation. In the instant case, however, it has not been established that the items constituting the prepaid expenses were correspondingly included as part of the operating cost items considered int he working capital computation. Since the burden of proof with respect to this item is on respondent, and since respondent has not sustained his burden in this regard, we are compelled to exclude the prepaid expenses from the current assets computation. Finally, after carefully reviewing the record with respect to petitioner's investment in Carpenter Technology Corp. (Car-Tech), we have concluded that petitioner's investment in this corporation is business related. Car-Tech performs valuable physical testing and alloy analysis services for petitioner either for no charge at all or only a minimal charge. Because of the desirability of maintaining this valuable connection, we are persuaded that petitioner would not be inclined, absent highly extraordinary circumstances, to dispose of this stock. Accordingly, we have concluded that petitioner's investment in Car-Tech should not be characterized as a readily disposable current asset.
6. In this context, respondent has also questioned the validity of some of these uncompleted projects. For example, petitioner's $1,245,900 5-year plan was designed largely to increase petitioner's molding and cleaning facilities from a present capacity of 400 tons per month to an envisioned capacity of 600-650 tons per month. This increase would allow petitioner's cleaning and molding capacity to equal petitioner's already existing melting capacity. Respondent argues that since petitioner's plant has never exceeded a production level of 375 tons per month, it is not essential to increase its cleaning and molding capacity to correspond with its melting capacity. We find this argument to be short-sighted. This Court will not require industries to plan for future capacities only after maximum production capacity at any given level has been achieved. As long as additional capacity levels are reasonable (and we are persuaded that petitioner was reasonably concerned with increasing its ultimate production capacity), accumulations of surplus to finance this expansion are eminently reasonable in our estimation.↩
7. See, e.g., Delaware Trucking Company, Inc., T.C. Memo. 1973-29↩.
8. Petitioner further contends that it is entitled to use the higher of the operating expenses and cost of goods amounts for the subsequent or current year in computing its working capital needs for the current year. The operating cycle theory is merely a means of attempting to mathematically determine operating expenses for one business cycle during the subsequent taxable year. Since business entities are dynamic and constantly evolving, such mathematical computations cannot be transalted into rigid formulae. See Magic Mart, Inc., 51 T.C. 775, 792 (1969). Accordingly, we are inclined to agree with petitioner that the subsequent year's operating expenses and cost of goods sold should appropriately be considered in computing working capital needs for a current year. See Delaware Trucking Company, Inc., T.C. Memo. 1973-29↩. Nevertheless, we feel that petitioner was inconsistent in insisting that it be allowed to use either the next year's operating expenses and cost of goods sold or the current year's amount, depending upon which figure was higher. If petitioner is correct in contending that the subsequent year's figures are appropriate, then it should consistently use the subsequent year's figures in all cases, since this would produce a more accurate statistical working capital computation. Thus, since petitioner was inconsistent in its usage of a mixture of current and subsequent year's amounts in the instant case, we concluded that a consistent use of the subsequent year's figures would produce a more statistical result under the instant facts. 1. Including accumulations for entrance into precision steel castings business.↩